S16A1085. BENTON v. THE STATE.
(794 SE2d 97)

HINES, Presiding Justice.

Devonni Manuel Benton appeals his convictions and sentences for felony murder, aggravated assault, and possession of a firearm during the commission of a felony in connection with the shootings of Jasmine Lynn, who died, and Jarvis Jones, who survived. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that, shortly after midnight on September 3, 2009, Lynn was fatally shot beside the intersection of Mitchell Street and James P. Brawley Drive, on the campus of Clark Atlanta University. Earlier that evening, she had attended a birthday party for Tiffani Nixon, a friend, in Nixon's campus apartment. Nearby on campus that night was Benton, along with several friends. Benton was wearing a red hooded shirt, had his hair styled in a reddish-colored Mohawk, and carried a distinctive tan and red "Gucci" book bag.

A group of men, including Keith Reed, left Nixon's birthday party, got in a car, and passed Benton's group as they walked. Unfriendly looks were exchanged between the two groups, which escalated into an exchange of angry words, and Benton displayed a handgun he had taken from his book bag; someone from the car made

---

[1] The crimes occurred on September 3, 2009. On October 16, 2009, a Fulton County grand jury indicted Benton for malice murder, felony murder while in the commission of the aggravated assault of Lynn, the aggravated assault of Lynn, the aggravated assault of Jones, possession of a firearm during the commission of a crime, and participation in criminal street gang activity. Benton was tried before a jury February 16-20, 2010. An order of nolle prosequi was entered on the charge of participation in criminal street gang activity, and Benton was acquitted of malice murder but found guilty of the remaining charges. On February 22, 2010, Benton was sentenced to life in prison for felony murder, a concurrent sentence of 25 years in prison for the aggravated assault of Jones, and a consecutive sentence of five years in prison for possession of a firearm during the commission of a crime; the aggravated assault of Lynn merged with the felony murder. See *Malcolm v. State*, 263 Ga. 369, 371-374 (5) (434 SE2d 479) (1993). Benton filed a motion for new trial on March 22, 2010, which he amended on May 1, 2014, and again on May 12, 2014. The motion, as amended, was denied on September 28, 2015. Benton filed a notice of appeal on October 13, 2015, and the appeal was docketed in this Court for the April 2016 term, and orally argued on July 12, 2016.

a remark to the effect that Benton would not use the handgun. On his cell phone, Reed called another friend, Anthony Miller, who was still at Nixon's birthday party, to tell him about the incident. Miller and others, including Lynn and Nixon, left the party and went outside where they discovered that Reed and his companions had exited their car and a physical fight had broken out between the two groups. Miller attempted to assist his friends, and some other people in the area simply observed the melee.

An acquaintance of Benton's was being beaten at the center of the fight. Lynn attempted to break up the fight, and Benton ran down Mitchell Street and fired several gunshots into the melee; Lynn was fatally struck by a bullet in the torso, and Jones, who was not involved in the fight, was struck in the forearm. An onlooker attempted to tackle Benton, and Benton ran from the area, leaving his book bag on the street; the book bag was linked to Benton by his fingerprints found on the bag and on an item therein.[2] Within two days of the shootings, Benton changed his hair style to a low cut one, such that the coloring in the ends of his hair when worn as a Mohawk had been cut off.

At trial, Benton testified that he was at the scene of the shootings, but claimed that, as he ran down Mitchell Street, away from the fight, a friend of his, Clarence Carter, ran down the other side of the street, and that it was Carter who fired gunshots back into the melee; he also testified that he and Carter had been dressed alike on the night of the shootings, although Carter wore a dreadlocks hair style.[3] Benton also testified that, in fleeing the fight, he dropped his book bag as it would only impede his flight, and that he was the only person in the area that night with a book bag; he also admitted that he lied to investigators, giving a false version of his arrival and departure from the area, and telling them that he did not have a Mohawk hair style on the night of the shootings, and that — before speaking with law enforcement investigators — he had collaborated with Carter and other friends who were with him at the scene of the fight and the shootings, in coming up with the false story he originally gave investigators. Benton also produced two witnesses who testified that Carter made remarks to them that they interpreted to mean that he committed the shootings. Several witnesses testified that the shots came from Mitchell Street,[4] down which Benton ran, and that the

---

[2] At trial, Benton stipulated to his fingerprints being on the bag, and on the item inside it, and that the bag was his.

[3] Carter testified that he wore a long dreadlocks hair style at the time of the shootings.

[4] Six 9mm shell casings were found on Mitchell Street almost a city block from where the victims were struck.

man with the Mohawk, red hooded shirt, and book bag ran there; Brandon Hall, a bystander to the fight, identified Benton at trial as the shooter.

1. Benton does not contest the legal sufficiency of the evidence of his guilt. Nevertheless, in accordance with this Court's general practice in appeals of murder cases, this Court has reviewed the record and concludes that the evidence at trial authorized the jury to find Benton guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Jury deliberations in Benton's trial began on Friday, February 19, 2010, continued well into the evening, and the court arranged for the jury to resume deliberations the next morning. As the courthouse was not generally open on Saturday, the court instructed the jury as to the procedures that jurors would use to enter the courthouse through the parking garage, including the need for identification, and a copy of a court order that was provided to the jurors to allow entrance. When one juror inquired about entry if arriving by public transit, the court said the juror should come in the main courthouse entrance, and then said: "I really don't want you coming in [that entrance] if I can help it." After discussion with a deputy sheriff, the court directed the juror who made the inquiry to meet with the deputy sheriff for specific instructions.

After the jury left the courtroom, the court told the parties "[t]he courthouse is not open to the public tomorrow, generally. There are certain people that I've allowed, different sides. So we make sure that certain people can be brought in. Everybody understand?" Neither the State nor the defense voiced any objection or concern, and, after the court established the time for the attorneys to appear in the morning, court was adjourned for the night.[5] The next day, several individuals were allowed entry to the courthouse, but a number were turned away, including Benton's sister, mother, and grandmother.[6]

---

[5] The court provided courthouse security personnel with an "Order Allowing Saturday Building Access." The order contained 29 names, many of whom were members of the press; it also contained the names of Benton's aunt, cousin, girlfriend, and at least one other friend of his. During the hearing on Benton's motion for new trial, Benton's trial counsel first testified that he "assumed the [courthouse] was always open while we were having trial even on the weekends . . . ." The court stated that it "would have asked the courtroom, I had to say, State, tell me who you want [to have access to the courthouse], defense, tell me who you want in, because as we have established, the courthouse is . . . closed on Saturdays." Benton's trial counsel agreed with the court's conclusion that it had procured a list of persons to attend the Saturday session of the trial, and testified: "I remember the court asking that question [about a list of persons to be admitted on Saturday], and, wow, Judge, I just don't have a clue."

[6] The names of these relatives were not on the court's "Order Allowing Saturday Building Access."

Benton contends that this violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and Art. I, Sec. I, Par. XI (a) of the Georgia Constitution of 1983. Of course, a criminal defendant may forfeit a constitutional right by failing to timely assert it. *Peretz v. United States*, 501 U. S. 923, 936-937 (111 SCt 2661, 115 LE2d 808) (1991). Generally, to preserve appellate review of a claimed error, "there must be a contemporaneous objection made on the record at the earliest possible time. Otherwise, the issue is deemed waived on appeal." (Footnotes omitted.) *Spickler v. State*, 276 Ga. 164, 166-167 (5) (575 SE2d 482) (2003). And, this principle certainly applies when a criminal defendant seeks to assert that a trial court's action deprived him of the right to a public trial. See *Reid v. State*, 286 Ga. 484, 488 (3) (c) (690 SE2d 177) (2010); *Henderson v. State*, 207 Ga. 206, 214 (2) (60 SE2d 345) (1950). See also *State v. Abernathy*, 289 Ga. 603, 611 (5) (715 SE2d 48) (2011) (Without objection at trial, a claim that an issue of court closure deprived a defendant of a public trial may be raised only in the context of a claim of ineffective assistance of counsel.) As noted, Benton did not object to the trial court's announcements regarding access to the courthouse on Saturday, and the procedures established to secure admittance, despite ample opportunity to do so, and he has waived his right to appellate review of the trial court's action. *Spickler*, supra.

3. Benton contends that his trial counsel failed to provide effective assistance by failing to interview Darius Brooks, a potential witness, and by failing to present Brooks's testimony at trial, contending that doing so would have impeached Brandon Hall's identification of Benton as the shooter, as well as identification testimony of other witnesses. To prevail on this claim, Benton must show both that his trial counsel's performance was deficient, and that his trial counsel's deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, id. at 784, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course. *Redding v. State*, 297 Ga. 845, 850 (5) (778 SE2d 774) (2015). To meet the second prong of the test, Benton must show that there is a reasonable probability that, absent

any unprofessional errors on counsel's part, the result of his trial would have been different. *Smith*, supra at 783. " 'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

As noted, a number of witnesses testified at trial to the movements and appearance of the shooter, an appearance that matched that of Benton, but only Hall specifically identified Benton as the shooter. At the hearing on Benton's motion for new trial, Brooks testified that he was with Hall on the street at the time of the shootings and fled with Hall from the scene of the shootings, and that Hall told Brooks that he could not identify the shooter; Brooks did not testify at trial. Trial counsel was provided with an audio recording of Brooks's interview with investigators, but did not listen to it before trial. Benton contends that, had trial counsel done so and ultimately called Brooks to testify at trial, the result of the trial would have been different. But, like the trial court, we find that Benton failed to meet the prejudice prong of the *Strickland* test.

Regarding Hall's identification of the shooter, Brooks's testimony was that, "right after" the shootings, Hall said that he did not recognize the shooter, did not know who the shooter was, and could not identify him; Brooks did not testify that Hall said he had not seen the shooter's face.[7] Even accepting Brooks's testimony as being akin to a statement by Hall that, at the time the statement was made, Hall did not believe he would be able to make an in-court identification of the shooter,[8] this statement was made before Hall was shown a photographic array from which he identified Benton as the shooter; Brooks did not testify that Hall made any statement regarding the sureness of his identification of Benton *after* that identification.

Benton also asserts that Brooks's testimony would call into question the testimony of multiple witnesses who said that the shooter had a red Mohawk hair style. In his testimony during the motion for new trial hearing, Brooks said that the shooter wore a hood over his head, and that he consequently could not see the shooter's hair,[9] but that a man with a red Mohawk was at the center of the fight,

---

[7] At the motion for new trial hearing, Hall was not called to testify regarding any statement to Brooks. At trial, Hall testified that he had a good look at the shooter's face.

[8] In his own statement to investigators, Hall said that he had seen the shooter around campus "a few" times before, but did not provide a name for the shooter.

[9] Some witnesses at trial testified that the shooter's hood was up, but not so far that they could not see that he had a red-colored Mohawk hair style.

away from where the gunshots came.[10] But, even if the jury accepted Brooks's statement that the fighting man had a hair style Brooks described as a red Mohawk, that would not cast doubt on testimony regarding the *shooter's* hair style, which Brooks did not see. Rather, Brooks was clear, in both this testimony during the hearing on the motion for new trial, and in his statement to investigators, that the man who went down Mitchell Street, and was thus the shooter,[11] carried a book bag. This was consistent with Hall's testimony, and with that of multiple eyewitnesses who stated that the man on Mitchell Street who fired the gunshots carried a book bag; the hair style of another person away from the area of the gunshots was irrelevant to that identification. The book bag was found on Mitchell Street with Benton's fingerprints on it; he admitted it was his, and that he had left it there. As the trial court found, there is no reasonable probability that, had trial counsel presented the testimony of Brooks at trial, the result of his trial would have been different. See *Sanders v. State*, 290 Ga. 637, 641-642 (5) (723 SE2d 436) (2012); *Allen v. State*, 286 Ga. 392, 398-399 (5) (a) (687 SE2d 799) (2010).

*Judgments affirmed. All the Justices concur, except Hunstein, J., who concurs in Divisions 1 and 3 and concurs in judgment only in Division 2.*

DECIDED NOVEMBER 21, 2016.

*Brian Steel*, for appellant.
*Paul L. Howard, Jr., District Attorney, Paige Reese Whitaker, Marc A. Mallon, Assistant District Attorneys; Samuel S. Olens,*

---

[10] Brooks did not tell investigators in his initial interview that the Mohawk was red-colored, or was otherwise remarkable. Confusion over the "Mohawk hair style" of the man at the center of the fight was made clear at trial. One bystander testified that the fighting man "looked like he had a Mohawk." Exploration of this description established that the witness did not "know what they call that [hair] style, but I know its not a regular cut. I know he had more hair on the top than the sides," and the hair style "looked like a high-top fade." Other trial testimony was that the man had a "box cut fade," a "Fresh Prince" hair style, and "like a box, like the back of [the hair style] skinned . . . a high fade"; there was no testimony at trial that the man in the fight had red-colored hair. Although a witness who saw the shooter "from my peripheral" said the shooter wore his hair in short dreadlocks style, this witness's testimony was that the shooter was the man with the book bag.

[11] In his statement to investigators, Brooks said the man with the book bag was the only man "that went down [the street from which the shots were fired]." That no one else went there was consistent with the testimony of other witnesses.

*Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mary C. Greaber, Assistant Attorney General*, for appellee.