308 Ga. 520
FINAL COPY

S20A0176.  MORRIS v. THE STATE.

BETHEL, Justice.

A Fulton County jury found Darius Morris guilty of malice

murder and other offenses in connection with the shooting death of

Jameson Bush.[1] Morris appeals, arguing that he was denied the

---

[1] The crimes occurred on August 8, 2007. Morris was indicted with Desmond Davis and David Handy by a Fulton County grand jury on February 1, 2008. Morris was indicted for malice murder, two counts of felony murder (one predicated on aggravated assault and one predicated on possession of a firearm by a convicted felon), aggravated assault with a deadly weapon, armed robbery, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. Davis's and Handy's cases are not part of this appeal.

At a severed, bifurcated jury trial held from August 23 to 26, 2011, Morris was found not guilty of felony murder predicated on possession of a firearm by a convicted felon and not guilty of possession of a firearm by a convicted felon. He was found guilty of all remaining counts with which he was charged. On September 13, 2011, the trial court sentenced Morris to a term of life imprisonment for malice murder, a consecutive term of life imprisonment for armed robbery, and a consecutive term of five years' imprisonment for possession of a firearm during the commission of a felony. All remaining counts were either vacated by operation of law or merged for sentencing purposes.

Through his trial counsel, Morris filed a motion for new trial on September 7, 2011. Morris filed a pro se motion for new trial on September 30, 2011. Through new counsel, Morris filed an amended motion for new trial on January 9, 2017, which he subsequently amended twice in May and June 2018. After a hearing on January 10, 2019, the trial court denied Morris's amended motion for new trial in an order dated February 5, 2019. Morris filed a notice

right to a timely appeal, that the trial court erred in restricting voir dire as to the religious beliefs and connections of potential jurors, that the trial court erred by giving a confusing jury charge regarding statements of co-conspirators, that the trial court erred by violating his right to a public trial by ordering that the courtroom doors be closed and locked during the court's charge to the jury, and that his trial counsel provided ineffective assistance by not objecting to the closure of the courtroom. Finding no error, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In the early evening hours of August 8, 2007, Jameson Bush went to Adom Martin's room at a boarding house located at 825 Beckwith Street in Atlanta. The house is a duplex with both front and back entrances on the ground floor. The front entrance faces south onto Beckwith Street, and the back entrance opens to a lot that backs up to houses along Drummond Street, which runs parallel to Beckwith Street to

of appeal on February 7, 2019, and an amended notice of appeal on August 16, 2019. This case was docketed to this Court's term beginning in December 2019 and was submitted for a decision on the briefs.

the north.

Several other individuals, including David Handy, Robert Scott, and a man named Chris, were in Martin's room over the course of the evening. Handy and Martin were selling marijuana out of Martin's room. Several people in the room noticed that there was tension between Handy and Bush that evening. Upon Bush's arrival at Martin's room, Bush sat down, pulled out a "wad" of money, and counted it. Bush owed Handy $250 but refused to pay anything to him. After an argument between Bush and Handy, Handy went onto the front porch of the house. He received a phone call from Morris asking Handy for marijuana. Handy told Morris that he had some marijuana but that he had something else for Morris to do as well. Morris owed Handy $100. Handy told Morris that if he robbed Bush, that would satisfy Morris's debt to Handy.

In a series of phone calls, Handy and Morris discussed how to complete the robbery of Bush. Handy told Morris he would leave the back door of the boarding house open and would call Morris to tell him when he was leaving. Morris wanted to know when Handy was

going to leave and how many people were in Martin's room. Handy told Morris he would leave the house and go to the gas station around the corner. When Handy left the house, he called Morris to let him know that it was time for him to go through the back door and get the money. Martin, Scott, Chris, and Bush were still in Martin's room when Handy left.

After Handy left the house, two armed men, who were later identified as Morris and Desmond Davis, pushed their way into Martin's room. Morris and Davis told everyone in the room to get on the ground. Morris and Davis were wearing masks and gloves. Davis had a rifle, and Morris had a handgun.

Morris and Davis flipped over the furniture in the room and made everyone in the room empty their pockets. Davis stood by with his gun while Morris searched the room. They took all the money and marijuana they found in the room and in everyone's pockets and kept asking about weapons and drugs. Morris and Davis also found Martin's gun in the room and took it.

Morris and Davis told those in the room that they were going

to start shooting if Martin did not tell them where the rest of the drugs were located. Davis asked, "Who are we going to kill first?" Martin and Bush then began pleading with Morris and Davis not to shoot.

At that point, Bush stood up behind a chair and told Morris and Davis not to shoot him. Davis then suddenly shot Bush in the arm. Bush screamed, "He shot me, he shot me!" and fell to the ground. Morris and Davis then shot Bush eight more times. After the shots were fired, Morris and Davis dropped some of the money they were holding and ran out of the room and through the back door of the house. No one else in the room was shot.

Several people in the house called 911. When police officers responded to the 911 call, they found Bush in Martin's room. He was unresponsive. When the officers looked around the house, they found that the back door of the house was open, the mattresses in Martin's room were overturned, and the room appeared to have been "rummaged." Money was strewn across the floor of Martin's room and on the ground outside the back door of the house. Three metal

bullet fragments and ten cartridge casings were found on the floor of the room, and police determined that at least ten rounds of ammunition had been fired inside the room. The cartridge cases that were recovered were for bullets commonly fired from AK or SKS rifles. No firearms were located at the scene, but each of the cartridges was determined to have been fired from the same rifle.

During an autopsy of Bush, the medical examiner also recovered from Bush's body a .38 caliber bullet that could have been fired from a .357 Magnum revolver and three "rifle-type bullets." Bush suffered eight gunshot wounds. The medical examiner determined that the cause of death was gunshot wounds to Bush's head and torso and that the manner of death was homicide.

At the time of the crimes, Morris and Davis lived together in a house at 874 Drummond Street. Davis's girlfriend testified that about two weeks before Bush was shot, she saw a rifle and a .357 handgun at the house Morris and Davis shared. She did not see those guns again after Bush was shot.

The day after Bush was shot, Handy went to 874 Drummond

Street to see Morris. Morris tried to give Handy some money, and Handy slapped it out of his hand. When Handy asked why Morris and Davis shot Bush, Morris said they shot him because he would not give them money. About a week later, Davis told his girlfriend that he and Morris shot Bush because Bush would not give them the money he was holding. Davis told his girlfriend that he shot Bush three times and that Morris shot Bush twice.

Frank Saleem testified that he saw Morris and Davis sitting in a car on a side street near 825 Beckwith on the evening of August 8, 2007, before the shooting occurred.  About 20 minutes later, Saleem went to 825 Beckwith to buy marijuana. As he reached the front door of the house, Saleem heard commotion inside, followed by several gunshots. He then ran away from the house and up the street to the house of another neighbor named Dre. He told Dre that someone had been shot, and he and Dre came back to 825 Beckwith. While walking back to Beckwith Street, Saleem noticed that the car Morris and Davis had been sitting in earlier was gone. Saleem also testified that he saw a rifle and a handgun at Morris's and Davis's house on

Drummond Street prior to Bush's shooting. Saleem testified that he never saw the guns again after August 2008.

Though not raised by Morris as error, in accordance with this Court's practice in appeals of murder cases, we have reviewed the record and find that the evidence, as summarized above, was sufficient to enable a rational trier of fact to find Morris guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. Morris argues that he was denied his right to a timely appeal due to the State's delay in filing a complete transcript of the proceedings in the case. He argues that this delay violated his right to due process under the Fourteenth Amendment of the United States Constitution. For the reasons that follow, we agree with the trial court that it did not.

Morris's trial counsel timely filed a motion for new trial on September 7, 2011. The court reporter, Cheryl Gilliam, prepared and submitted Volumes 1, 2, 3, and 5 of the five-part trial transcript on November, 14, 2013, over two years after Morris filed his motion. Volumes 1–3 included jury selection, opening statements, the State's presentation of evidence in the first part of the bifurcated trial, the State and defense resting, and the beginning of the charge conference. Volume 5 contained the conclusion of the sentencing hearing.[2]

Volume 4, which was not submitted by Gilliam at that time, ultimately contained the conclusion of the charge conference, closing arguments, the charge of the court, questions submitted to the court by the jury during its deliberations, the verdict, part of the sentencing hearing, and the second part of the bifurcated trial as to charges relating to Morris possessing a firearm by a convicted felon and the corresponding felony murder charge. Gilliam was not

---

[2] Volume 5 was apparently later supplemented to include the hearing on Morris's motion for new trial.

present on the day of trial covered by Volume 4. Instead, a substitute court reporter, Paulette Lester, was present in court that day.

The record reflects that Morris wrote seven letters to the superior court clerk between January 2012 and December 2015 requesting his transcript and case records while his motion for new trial remained pending. New appellate counsel for Morris was appointed on December 7, 2015, but apparently withdrew from representing Morris in early 2016. Morris's current appellate counsel was appointed in April 2016 and immediately began requesting the transcripts. All volumes except Volume 4 were provided. Only after Morris's appellate counsel contacted the court reporter on multiple occasions did counsel learn that Lester, not Gilliam, was present on the day of trial covered by Volume 4.

On January 9, 2017, appellate counsel filed an amended motion for new trial alleging that Morris's right to a timely appeal had been violated by the failure to provide Volume 4. On November 27, 2017, the State filed a motion for appointment of a successor court reporter to produce a transcript of Volume 4. The court denied

that motion on December 7, 2017, but instead issued a rule nisi to Lester to detail the reasons for the delay in producing Volume 4. The court held a hearing on December 20, 2017,[3] at which time Lester testified regarding the missing volume. She indicated that she had trouble hearing the proceedings embodied in Volume 4 and that it had taken some time to produce a transcript from the recordings she had made. Lester agreed to file a transcript by January 22, 2018. That deadline passed, and Morris filed additional motions notifying the court of that fact and seeking a ruling on his amended motion for new trial. Finally, on March 21, 2018, over six years after Morris filed his motion for new trial, the official court reporter, Gilliam, filed and certified Volume 4.

Morris argues that due to the series of delays occasioned by the inability to obtain the full transcript of his trial proceedings, his right to prosecute a timely appeal has been frustrated in violation of his right to due process under the Fourteenth Amendment of the

---

[3] While the record reflects the occurrence of this hearing and the general nature of what was discussed, a transcript of this hearing does not appear in the appellate record.

United States Constitution. He also argues that the certification of Volume 4 by Gilliam — who was not present in the court when the proceedings embodied in Volume 4 occurred — is improper, as such certification should have been made by Lester, who was present in court that day. He further argues that the substantial delay was attributable to the State and that he has been prejudiced by the failure to provide the transcript given Lester's admission that she had difficulty hearing portions of the proceedings embodied in Volume 4. He argues that reversal of his convictions and the grant of a new trial is the only way to remedy this error.

We review Morris's claim under the four-part balancing test set forth in *Chatman v. Mancill*, 280 Ga. 253, 256-260 (2) (626 SE2d 102) (2006). Under *Chatman*, the court must examine the "length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (Citation and punctuation omitted.) 280 Ga. at 256-257 (2) (a) (adopting the four-factor test for speedy-trial claims set forth in *Barker v. Wingo*, 407 U. S. 514, 530 (92 SCt 2182, 33 LE2d 101) (1972), for claims involving a right to a timely

appeal).

The State concedes that the delay in obtaining Volume 4 of the transcript was significant, that it was the State's duty to produce the transcript, that the failure to do so was attributable to its errors, and that Morris and his appellate counsel have been diligent in seeking Volume 4. Even so, the State argues, and we agree, that Morris has not shown any prejudice from the delay in obtaining Volume 4 of the transcript. To do so, Morris must demonstrate that but for the delay in obtaining the transcript, "the result of the appeal would have been different." (Citation and punctuation omitted.) *Chatman*, 280 Ga. at 260-261 (2) (e). Here, despite significant delays, Volume 4 of the transcript was finally completed, certified, and provided to Morris in March 2018. Once certified by Gilliam, the transcript was presumed to be accurate and complete. See OCGA § 15-14-5 ("Subject only to the right of the trial judge to change or require the correction of the transcript, the transcript so certified shall be presumed to be true, complete, and correct."). There has been no showing by Morris of any inaccuracy or omission in Volume

4 of the transcript,[4] and mere speculation that inaccuracies or omissions exist due to difficulty on the part of Lester in hearing portions of her recordings of the proceedings covered by Volume 4 of the transcript is not sufficient to establish that Morris has been prejudiced by the delay in obtaining the transcript. See *Payne v. State*, 289 Ga. 691, 695 (2) (b) (715 SE2d 104) (2011) (appellant's "generalized speculation about the delay's effect on witness memories and evidence is not the kind of specific evidence required to show prejudice in the appellate-delay context" (citation and

---

[4] We note that Morris does not appear to have made any post-trial motion to amend or correct the trial transcript. See OCGA § 5-6-41 (f). See also *State v. Nejad*, 286 Ga. 695, 699 (1) (690 SE2d 846) (2010) ("OCGA §§ 5-6-41 and 5-6-48 provide means by which a purportedly-incomplete transcript may be amended and certified by the trial court: where a party contends the transcript does not fully disclose what transpired in the trial court and the parties are unable to agree thereon, the trial court has a hearing and resolves the difference."). We also note that the appellate record does not reflect any attempt by Morris to obtain and review the substitute court reporter's audio recordings of the proceedings embodied in Volume 4. Although such recordings are not part of the court record unless filed with the court and are not normally available to the parties or the public, such recordings "may be made available if some reason is shown to distrust the accuracy of the stenographic transcript." (Citation and punctuation omitted.) *Undisclosed LLC v. State*, 302 Ga. 418, 432 (4) (a) (807 SE2d 393) (2017). In this case, review of such recordings might have alerted Morris to inaccuracies in Volume 4 or, at a minimum, enabled him to provide the trial court with evidence — rather than mere speculation — that portions of the recording were of such poor quality that they could not support an accurate transcription of the proceedings.

punctuation omitted)). Accordingly, we agree with the trial court that Morris has not demonstrated prejudice from the delay in receiving Volume 4 of the trial transcript. His claim that such delay violated his right to a timely appeal therefore fails. See *Veal v. State*, 301 Ga. 161, 168 (3) (800 SE2d 325) (2017) ("[W]e have repeatedly found that the failure to make [a] showing [of prejudice] in an appellate delay claim to be fatal to the claim, even when the other three factors weigh in the appellant's favor.").

3. Morris argues that the trial court erred by impermissibly restricting voir dire of potential jurors as to their religious beliefs and connections. We disagree.

Just before voir dire of potential jurors commenced, the trial court had the following discussion with the attorneys:

> COURT: For gosh sakes, please don't ask the religion question, anybody. Please don't do that. If you ask the religion question, we'll lose a bunch. If they have religious problems, they will tell us they have problems, okay, making a decision. So I don't — even though it's on that list, I don't ask it, okay?
> PROSECUTOR: So you don't want us to ask that either?
> COURT: I do not want you to ask it. It's nothing but a devil's playground. With all due respect to the religion

question, I'll rephrase that and say it's God's playground. Then everybody says, oh, I can't do this. Oh, and so then we have to do this. We have to voir dire them extensively and find out that they really can make a decision because they make major decisions every day affecting everybody's life. You know, the usual routine. If they have a religious problem, if they're Jehovah's Witnesses or they don't want to make a decision about somebody's life, they will tell us that. That's my experience. So stay away, please. Now, I can't order you to stay away, but I'm asking you to stay away.

Morris's trial counsel made no objection to these statements by the trial court when they were made, and after the jury was selected, trial counsel offered no objection to the manner of selecting the jury. Even so, Morris contends that these statements by the trial court violated his rights to examine potential jurors under OCGA § 15-12-133, particularly as to their "religious, social, and fraternal connections."[5] Morris argues that the trial court's request to avoid

---

[5] OCGA § 15-12-133 provides, in relevant part:

In all criminal cases, both the state and the accused shall have the right to an individual examination of each prospective juror from which the jury is to be selected prior to interposing a challenge. . . . In the examination, the counsel for either party shall have the right to inquire of the individual prospective jurors examined touching any matter or thing which would illustrate any interest of the prospective juror in the case, including any opinion as to

questions about religion relied upon a misguided assumption that lay jurors would volunteer information that the attorneys would need to assess their fitness as jurors.

As Morris's appellate counsel conceded below, the trial court did not order the parties to refrain from asking questions regarding the potential jurors' religious beliefs and connections, but rather merely requested that they not do so.[6] In any event,

> [t]here was no objection by [Morris] to the court's instruction that the attorneys stay away from these areas and no indication of what questions [Morris's] attorney would have liked to ask. Therefore, even if there were questions which [Morris's] attorney should have been allowed to ask on voir dire, there is no record of any attempt to ask such questions or the court's refusing to allow them.

---

which party ought to prevail, the relationship or acquaintance of the prospective juror with the parties or counsel therefor, any fact or circumstance indicating any inclination, leaning, or bias which the prospective juror might have respecting the subject matter of the action or the counsel or parties thereto, and the religious, social, and fraternal connections of the prospective juror.

[6] At the hearing on the motion for new trial, Morris's appellate counsel said, "I'll certainly concede that the court did not order anybody not to ask the religion question." In response to a question from the court, appellate counsel went on to note that the trial court's statements about not asking questions about religion "was just dialogue" as opposed to a ruling by the trial court.

*Fugitt v. State*, 254 Ga. 521, 522 (3) (330 SE2d 714) (1985). Because

Morris failed to preserve any objection to the trial court's

statements, this enumeration fails. See *Brockman v. State*, 292 Ga.

707, 720 (8) (739 SE2d 332) (2013) ("[The appellant] raised no

objections on the stated grounds at the time of voir dire and, thus,

has not preserved these issues for appeal.").

4. Morris argues that the trial court erred by giving a confusing

charge to the jury regarding admissions or statements of co-

conspirators. We disagree.

At the State's request, when it charged the jury, the trial court

gave the then-current pattern jury instruction regarding admissions

or statements of co-conspirators with certain additions that had

been requested by the State:

> Now, ladies and gentlemen, admissions or statements of co-conspirators. If the existence of a conspiracy has been shown beyond a reasonable doubt *by evidence other than the out-of-court admissions or statements of any of the alleged co-conspirators*, then any admission or statements made by one or more of the co-conspirators — or the conspirators during and in furtherance of the alleged conspiracy may be considered by you, the jury, against all of the conspirators. However,

or rather, should you determine that there was no conspiracy or if you are not satisfied beyond a reasonable doubt that a conspiracy existed at the time a particular admission or statement was made, that the defendant on trial was not . . . a party to a conspiracy, *that the existence of a conspiracy has been shown only by the out-of-court admissions or statements of co-conspirators*, that the alleged admissions or statements by co-conspirators were not made in furtherance of the alleged conspiracy, or that no admissions or statements were made to a third party by an alleged co-conspirator, then you are to disregard any testimony as to any alleged admissions or statements made out of the presence of the defendant by an alleged co-conspirator.

(Emphasis supplied for portions of instruction added to the language of the pattern instruction at the State's request.) See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.02.40 (2006).

Morris's trial counsel objected to this instruction at the charge conference, noting that one sentence in the instruction was over 120 words in length and that he did not "see how anybody can make sense out of it." Morris notes that, in the charge conference, the trial court agreed that the charge was confusing when it stated, "I don't make sense of it, and that is okay.  That is what the pattern is, other than those qualifiers that I put in there." Trial counsel reiterated

the objection to this instruction once the trial court concluded its charge to the jury.

"[A] jury instruction must be adjusted to the evidence and embody a correct, applicable, and complete statement of law." (Citation and punctuation omitted.) *Roper v. State*, 281 Ga. 878, 880 (2) (644 SE2d 120) (2007). As Morris's appellate counsel admitted at the hearing on the motion for new trial, the instruction given by the trial court largely tracked the then-current pattern instruction on statements and admissions by co-conspirators, noting that there was "very little deviation" from the pattern charge and that "there were some minor adjustments made based upon the specifics of the case and how the evidence came out at trial." We agree with appellate counsel's characterization of the instruction. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.02.40 (2006). Moreover, the record reflects that the additions to the pattern instruction were included by the trial court at the State's request for the express purpose of tailoring the pattern instruction to the needs and circumstances of the case. Specifically, one of

Morris's co-conspirators, Davis, made certain out-of-court statements to his girlfriend about the robbery and murder of Bush that were admitted at trial as declarations of co-conspirators. Under the former Evidence Code, those out-of-court statements could only be admitted if other evidence (apart from those statements) established the existence of a conspiracy. See *Lord v. State*, 304 Ga. 532, 538 (5) (b) (820 SE2d 16) (2018) (Under the former Evidence Code, "[t]he co-conspirator hearsay exception permitted admission of the hearsay statement of a co-conspirator, made in the course of the conspiracy, so long as a prima facie case of conspiracy was established apart from the hearsay statement itself." (citation and punctuation omitted)). See also former OCGA § 24-3-5 ("After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all."). However, the record reflects that, because Morris's other co-conspirator, Handy, testified at trial about the conspiracy to rob Bush, the State wanted to add language to the pattern charge clarifying that, while Davis's out-of-court statements

could not be used to make the prima facie showing of conspiracy, Handy's in-court testimony could be used by the jury for that purpose.

Thus, the charge given by the trial court was an accurate statement of the law that was properly adjusted to the evidence and circumstances of the case. Although the instruction given to the jury was lengthy, the jury was provided with a copy of the instruction during its deliberations and asked no questions about it. "[Q]ualified jurors under oath are presumed to follow the instructions of the trial court," *Allen v. State*, 277 Ga. 502, 504 (3) (c) (591 SE2d 784) (2004), and Morris has offered no evidence that the jury was confused or misled by this instruction or that the jury did not follow the instruction as given. This enumeration of error therefore fails.

5. Morris argues that the trial court's direction to close and lock the doors to the courtroom while the court charged the jury violated his right to a public trial under the Sixth and Fourteenth Amendments to the United States Constitution and Art. I, Sec. I, Par. XI (a) of the Georgia Constitution of 1983. However, "[t]he

improper closing of a courtroom is a structural error requiring reversal only if the defendant properly objected at trial and raised the issue on direct appeal." *Reid v. State*, 286 Ga. 484, 488 (3) (c) (690 SE2d 177) (2010). Because the record reflects that Morris did not make a contemporaneous objection to the locking of the courtroom doors at trial, he has waived his right to appellate review of the trial court's action. See *Benton v. State*, 300 Ga. 202, 205 (2) (794 SE2d 97) (2016).

6. Finally, Morris argues that his trial counsel provided ineffective assistance by not objecting to the locking of the doors during the trial court's charge to the jury. Although Morris waived appellate review of the trial court's decision to lock the courtroom doors by failing to object, he may raise a claim that he was denied his right to a public trial in the context of a claim of ineffective assistance, and he has done so here. See *State v. Abernathy*, 289 Ga. 603, 611 (5) (715 SE2d 48) (2011) ("[B]ecause [the appellant] did not raise an objection to this procedure at trial, the issue of closure may only be raised in the context of an ineffective assistance of counsel

claim." (citation and punctuation omitted)). As with other claims of ineffective assistance, to prevail, Morris

> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance, [Morris] must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [Morris] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

(Punctuation omitted.) *Stuckey v. State*, 301 Ga. 767, 771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)).

"A strong presumption exists that counsel's conduct falls within the broad range of professional conduct." (Citation omitted.) *Ford v. State*, 298 Ga. 560, 566 (8) (783 SE2d 906) (2016). And "where, as here, the issue of a courtroom closure is raised in the context of an ineffective assistance of counsel claim, prejudice will not be presumed." *Reid*, 286 Ga. at 488 (3) (c).

Pretermitting whether the failure to object to the locking of the courtroom doors constituted deficient performance, Morris has failed to show how he was prejudiced by counsel's lack of objection. The record reflects, and Morris concedes, that the locking of the courtroom was announced in advance by the trial court, that the court gave those in the gallery the opportunity to remain in the courtroom after the doors were shut and locked, and that some individuals did so. Most importantly, Morris has not shown that any person who wished to be present in the courtroom for the charge of the jury was prevented from entering or remaining in the courtroom while the charge was given. Morris has thus failed to articulate how the trial court's locking of the courtroom and his counsel's failure to object to this action prejudiced his constitutional right to a public trial. "We therefore cannot find a reasonable probability that the outcome of the trial would have been different" had the courtroom doors not been locked during the trial court's charge to the jury. (Citation and punctuation omitted.) *Reid*, 286 Ga. at 488 (3) (c). Accordingly, his claim of ineffective assistance fails.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 20, 2020.
Murder. Fulton Superior Court. Before Judge Cox.
*Crawford & Boyle, Eric C. Crawford*, for appellant.
*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Marc A. Mallon, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.