**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: July 1, 2025

S25A0665.  ADAMS v. THE STATE.

LAGRUA, Justice.

In June 2019, Appellant Xavier Adams, Jr., was convicted of felony murder and other crimes in connection with the shooting death of Sean Peterson.[1] On appeal, Adams contends that (1) the trial court erred by failing to vacate his conviction for felony murder

---

[1] Peterson was shot on September 5, 2017. On March 28, 2018, a Clayton County grand jury indicted Adams for malice murder, two counts of felony murder (predicated on aggravated assault and possession of a firearm by a convicted felon), aggravated assault, and possession of a firearm by a convicted felon. At a trial from June 17 to 21, 2019, the jury found Adams guilty of voluntary manslaughter as a lesser offense of malice murder and felony murder predicated on aggravated assault and guilty on all the remaining counts. The trial court sentenced Adams to serve life in prison without the possibility of parole for felony murder predicated on possession of a firearm by a convicted felon. The remaining charges merged or were vacated by operation of law. On September 26, 2019, Adams filed a motion for new trial, which he amended with new counsel three times. After an evidentiary hearing on February 14, 2023, the trial court entered an order denying the motion for new trial on September 25, 2023. Adams filed a timely notice of appeal, and the case was docketed in this Court for the term beginning in April 2025 and submitted for a decision on the briefs.

predicated on possession of a firearm by a convicted felon under the modified merger rule; (2) the jury's guilty verdicts of voluntary manslaughter as a lesser offense of malice murder and felony murder predicated on aggravated assault were mutually exclusive from the guilty verdict on felony murder predicated on possession of a firearm by a convicted felon; (3) the trial court committed plain error by improperly commenting on evidence presented at trial; (4) the trial court committed plain error by not instructing the jury on the proximate cause standard for felony murder; and (5) the trial court committed plain error by omitting the proximate cause standard for felony murder in its response to a jury note. We affirm because the modified merger rule is inapplicable to this case, the jury's guilty verdicts of voluntary manslaughter on malice murder and felony murder predicated on aggravated assault and felony murder predicated on felon-in-possession were not mutually exclusive, the trial court did not improperly comment on the evidence presented at trial, the trial court did not commit plain error in failing to include the proximate cause standard in its jury

2

charges, and Adams affirmatively waived any claim of error by the trial court with respect to the trial court's response to the jury's question during its deliberations.

The evidence presented at trial showed that, in 2017, Adams, Peterson, and Adams's then-wife Destinee Pannell[2] were roommates at an apartment complex in Clayton County. On September 5, 2017, Peterson attempted to contact Adams by cell phone to explain that he did not have the entirety of his share of the rent, but Adams refused to speak with him. Around 7:45 p.m. the same day, Adams and Pannell were at their apartment when Peterson arrived, requesting to speak with Adams about the rent. The two men immediately began arguing, and Adams told Peterson that he had "something for [Peterson]," then walked into his bedroom. Pannell testified that she understood Adams's statement to mean that he was retrieving the gun that he kept in his nightstand, which he purchased in May or June 2017.

When Adams went into the bedroom, Peterson walked out of

---

[2] Adams and Pannell divorced prior to trial.

the apartment and returned with a 9mm pistol belonging to his girlfriend, Tasiana Harmon, who was waiting for Peterson in the parking lot of the complex. As Peterson reentered the apartment, Adams came out of his bedroom with the gun and pointed it at Peterson. While aiming the guns in each other's direction, the two men continued to argue until they decided to put their weapons down and "go outside and handle it a different way." Shortly after exiting the apartment, the men returned because, according to Adams, they did not want to be seen fighting by other residents in the complex.

Upon reentering the apartment, the men picked up their guns, resumed arguing, and started wrestling with their guns in hand. Pannell asked Peterson to get off Adams because Adams could not breathe, but Peterson said that he would not do so until Adams relinquished his gun. Subsequently, Adams and Peterson gave their guns to Pannell, who put both guns in a black handbag. A few moments later, Peterson asked for Harmon's gun back because he needed it for his security job. Adams told Pannell that if she gave

Peterson the gun back, he would "beat [her] ass."[3] Peterson then called Harmon from his cell phone to come retrieve the gun from Pannell. When Harmon entered the apartment, Adams instructed Pannell not to give Harmon the gun and demanded his gun back. The two men began to fight again, and while they fought, Pannell gave Harmon her gun, which Harmon put in the waistband of her pants.

Adams and Peterson eventually stopped fighting, and Peterson began exiting the apartment. While walking out, Peterson remarked that, if he found out that Adams had "put [his] hands on [Pannell], [Peterson would] come back for [Adams]." Adams responded, "get the hell out," causing Peterson to turn around. Peterson told Adams that he would leave once he collected all his belongings in the apartment and then walked into his bedroom. Pannell put the black handbag down, ran after Peterson, and urged him to leave before Adams got more upset. Upon exiting Peterson's bedroom, Pannell saw that Adams had his gun raised and pointed in Peterson's

---

[3] Adams had a history of physically abusing Pannell.

direction. Peterson exited the bedroom soon after and attempted to disarm Adams. Pannell testified that, when Peterson was attempting to take the gun away from Adams, she heard a gunshot. Pannell did not see who fired the gun because she immediately ran out the door of the apartment when she heard the shot but testified that the last person she saw with a gun was Adams. Harmon testified that she saw Adams grab his gun out of Pannell's black handbag and shoot Peterson. According to Harmon, when Peterson was shot, he was unarmed, and she had her gun in her waistband.

Shortly after exiting the apartment, Pannell heard someone say, "he shot me" and "get up, man, you all right. It's going to be okay. . . ." She did not know who made either statement. When Pannell came back into the apartment, she saw Peterson's dead body and asked Adams what happened and where the gun was. He responded that "the gun went off" and that he would not tell her where the gun was. Pannell tried to call the police, but Adams stopped her, saying that they needed to get rid of Peterson's body. When Pannell refused and insisted on calling the police, Adams

again prevented her and said that they needed to go to the nightclub where Adams worked to create an alibi.

On the way to the club, Adams threatened to harm Pannell if the police found out what happened and asked her "not to fold on him or turn him in." When they arrived at the club, Adams told Pannell that he needed lemon juice to remove any gunpowder residue from his body and clothing. According to Pannell, Adams then went to a nearby store "so that the manager could see his face as part of the alibi . . . ." Adams also put paint on his clothes and shoes to give the impression that he had been painting at the club and instructed Pannell to video call her daughter so she could see where they were. After about an hour, Adams and Pannell left the club and drove around Atlanta until Adams's brother called and informed him that he needed to go to his apartment because the police were there.[4] When they arrived at the apartment, Adams told Pannell to "ask where [Peterson] was to make it seem like [they]

---

[4] The record reflects that Harmon called 911 after the shooting, and the police responded to Adams's apartment around 8:45 p.m.

7

didn't know what had happened." As soon as the couple exited the car, they were immediately detained by the police.

Inside Adams's apartment, the police found Peterson dead with a gunshot wound to the back. No bullet was recovered from his body. Police also recovered a .40 caliber bullet near Peterson's body and a 9mm live round under his body. No shell casings were found at the scene, and the weapon used to shoot Peterson was never located. A ballistics expert testified that Harmon's gun did not fire the .40 caliber bullet found near Peterson's body. The medical examiner testified that Peterson's death was deemed a homicide caused by a gunshot wound.

At trial, the State presented evidence of jail calls between Adams and Pannell. On those calls, Adams said to Pannell, among other things, that "they don't have [the gun], no shell, no nothing"; Pannell needed to "tell [investigators] that [she] went home[,] and [Peterson] was in an altercation with Junior";[5] "why didn't you stick

---

[5] The record reflects that Adams also occasionally went by "Junior," but Pannell testified that, during this call, Adams was referring to another person named Junior.

to the f\*\*king story"; and "it was our story against her," which Pannell testified referred to Harmon.

1. Adams contends that the trial court erred by sentencing him for felony murder predicated on felon-in-possession rather than for voluntary manslaughter as a lesser offense of malice murder and felony murder predicated on aggravated assault counts, for which he was found guilty. He contends that under the modified merger rule articulated in *Edge v. State*, 261 Ga. 865, 866-868 (2) (414 SE2d 865) (1992), the trial court should have vacated the felony murder count predicated on felon-in-possession and entered a conviction and sentence for voluntary manslaughter. We disagree.

In *Edge*, this Court adopted a "modified merger rule," concluding that, where the jury finds a defendant guilty of voluntary manslaughter, "it cannot also find felony murder based on the same underlying aggravated assault" because the jury's guilty verdict of voluntary manslaughter necessarily implies that the very same assault was mitigated by provocation and passion. See id. at 865-866 ("If the jury finds voluntary manslaughter, it necessarily finds

9

the felonious assault was mitigated by provocation[] and committed without the *mens rea* essential to impute malice to the killing. Thus, the felony of assault in that instance cannot support a felony murder conviction because there is no malice to be transferred." (emphasis in original)). "We adopted such a rule because to hold otherwise would eliminate voluntary manslaughter as a separate form of homicide since, in that event, every voluntary manslaughter would also be a felony murder." *Smith v. State*, 272 Ga. 874, 879 (6) (a) (536 SE2d 514) (2000) (citation and punctuation omitted). Consequently, where a defendant is found guilty of voluntary manslaughter and felony murder predicated on aggravated assault, arising from the same assault, the trial court should vacate the felony murder verdict and "only the voluntary manslaughter conviction may stand." See *Edge*, 261 Ga. at 867 (2).

We subsequently extended the rule in *Edge* to apply in factual scenarios where "the felony murder is premised on another underlying felony that is equally integral to the homicide and susceptible of mitigation by the sort of provocation and passion that

10

voluntary manslaughter involves." See *Griggs v. State*, 304 Ga. 806, 808 (2) (822 SE2d 246) (2018) (citation and punctuation omitted) (refusing to extend *Edge* because the defendant's possession of a firearm as a convicted felon was independent of the killing). See also *Sanders v. State*, 281 Ga. 36, 37-38 (1) (635 SE2d 772) (2006) (extending *Edge* to aggravated battery and arson). However, we noted in *Edge* that the modified merger rule is inapplicable where "the underlying felony is *independent* of the killing itself, such as burglary, robbery, or even an assault that is directed against someone other than the homicide victim." *Edge*, 261 Ga. at 867 (2) n.3 (citation omitted) (emphasis supplied). See, e.g., *Anothony v. State*, 303 Ga. 399, 403 (2) (a) (811 SE2d 399) (2018) (concluding that "the culpability for unlawful participation in criminal gang activity is generally not susceptible of mitigation by the sort of provocation and passion that voluntary manslaughter involves"). And of particular relevance here, we have consistently refused to extend the rule in *Edge* to felony murder convictions predicated on possession of a firearm by a convicted felon. See, e.g., *DuBose v.*

*State*, 299 Ga. 652, 653-654 (2) (791 SE2d 9) (2016); *Amos v. State*, 297 Ga. 892, 893-894 (2) (778 SE2d 203) (2015); *Wallace v. State*, 294 Ga. 257 258-259 (2) (754 SE2d 5) (2013); *Lawson v. State*, 280 Ga. 881, 883 (3) (635 SE2d 134) (2006); *Sims v. State*, 265 Ga. 35, 36 (3) (453 SE2d 33) (1995).

Here, Adams's unlawful possession of a firearm was independent of the killing itself and not "the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person," OCGA § 16-5-2 (a), given that the evidence presented at trial showed that Adams possessed the gun he used to kill Peterson prior to the shooting. See *Griggs*, 304 Ga. at 809 (2) (concluding *Edge* was inapplicable where the evidence showed that the defendant had "acquired the gun that he used to kill [the victim] 'maybe five days' before the shooting"). Therefore, *Edge* is inapplicable, and the trial court did not err in entering a judgment of conviction on the jury's verdict finding Adams guilty of felony murder predicated on felon-in-possession and sentencing him accordingly.

12

2.     Adams next argues that the jury's guilty verdicts of voluntary manslaughter—on the malice murder and felony murder predicated on aggravated assault counts—and felony murder based on possession of a firearm by a convicted felon were mutually exclusive.

"The term mutually exclusive generally applies to two guilty verdicts that cannot legally exist simultaneously." *McElrath v. State*, 308 Ga. 104, 110 (2) (b) (839 SE2d 573) (2020) (emphasis removed) (punctuation omitted). "[I]f a jury returns verdicts of guilty on two counts of an indictment, and those counts are mutually exclusive, the convictions must be set aside and a new trial granted." *Smith*, 272 Ga. at 880 (6) (b) (citation omitted). We conclude that Adams's guilty verdicts were not mutually exclusive.

A guilty verdict of voluntary manslaughter requires that a jury find that the defendant intended to kill the victim, but such killing occurred as a "result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." See OCGA § 16-5-2 (a). To convict a

13

defendant for felony murder, a jury must find that he committed a felony, and during the commission of that felony, caused the death of another with or without malice. See OCGA § 16-5-1 (c). Critically, a jury need not conclude that the defendant intended to cause the death of another, only that he intended to commit the underlying felony. See *Smith*, 272 Ga. at 880 (6) (b).

Here, the intent supporting Adams's felony murder conviction was derived solely from the underlying felon-in-possession offense. Because felony murder predicated on felon-in-possession of a firearm does not require an intent to kill and considerations such as provocation or passion have no bearing on it, Adams's voluntary manslaughter conviction has no bearing on whether Adams committed felony murder predicated on felon-in-possession; rather, the felony-murder verdict indicated that the jury concluded that Adams intended to possess a firearm as a convicted felon, and during such possession, caused the death of Peterson. Therefore, the felony murder and voluntary manslaughter guilty verdicts were not mutually exclusive. See *Perez v. State*, 316 Ga. 433, 452 (4) (888

14

SE2d 526) (2023); *Smith*, 272 Ga. at 880 (6) (b) ("Significantly, to convict [the defendant] of felony murder, the jury did not have to find that [he] did not act with an intent to kill, as malice and intent to kill are not elements of the offense of felony murder.").

3. Adams argues that the trial court plainly erred in three respects. To show plain error, Adams (1) must point to an error that was not affirmatively waived, (2) the error must have been clear and obvious, (3) the error must have affected his substantial rights, and (4) the error must have seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *State v. Williams*, 308 Ga. 228, 231 (2) (838 SE2d 764) (2020). We need not analyze all of the elements of the plain error test if Adams fails to satisfy one of them. See *Hill v. State*, 310 Ga. 180, 194 (11) (a) (850 SE2d 110) (2020) (citation omitted). Here, we conclude that, as to two of his claims, Adams cannot show a clear or obvious error by the trial court and, as to the third claim, he affirmatively waived any alleged claim of error by the trial court.

(a) Adams first contends that it was plain error for the trial

court to improperly comment on the evidence presented at trial.[6]

During the cross-examination of Pannell, Adams's trial counsel asked her four times whether she shot Peterson. Each time Pannell responded that she did not. The fourth time the question was asked, the trial court interjected and said, "[m]a'am, do not. She's already said she did not." Trial counsel later asked, "Ms. Pannell, isn't it correct that [Adams] was concerned about you because he knew that you were the one who fired the gun that night?" After Pannell responded that she did not fire the gun, the trial court stated, "[Counsel], I'm going to have her step down if there's another question about that. She's already answered it." Trial counsel did not object to the trial court's comments.

"It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the

---

[6] Although Adams's brief does not address this enumeration of error under the plain error analysis, our review is limited to plain error because Adams did not object to the comments that he now wishes to challenge on appeal. See OCGA § 17-8-57 (b).

accused." OCGA § 17-8-57 (a) (1). Here, the record does not show that the trial court expressed an opinion about what had or had not been proven in the case; on the contrary, it merely stated what Pannell had already testified to, which does not violate OCGA § 17-8-57 (a) (1). See *Moore v. State*, 315 Ga. 263, 272 (4) (882 SE2d 227) (2022) ("To violate [OCGA § 17-8-57 (a) (1)], the trial court's comments must pertain to a disputed issue of fact." (citation and punctuation omitted)). Moreover, the trial court acted within its discretion "to keep the case moving along in the face of repetitive questions by defense counsel." *Gebhardt v. State*, 307 Ga. 587, 593 (3) (a) (837 SE2d 318) (2019) (citing OCGA § 24-6-611 (a) (2) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . [a]void needless consumption of time . . . .")). Therefore, there was no clear and obvious error here, and this claim fails.

(b) Adams next argues that it was plain error for the trial court to omit the proximate cause standard from its jury charge.

As noted above, felony murder occurs when, during the

commission of a felony, the defendant causes the death of another irrespective of malice. See OCGA § 16-5-1 (c). Proving that a defendant "caused" the death of another requires proof of "proximate cause," meaning that the defendant was both the cause in fact and legal cause of the death. See *Melancon v. State*, 319 Ga. 741, 751 2 (b) (906 SE2d 725) (2024) (citing *State v. Jackson*, 287 Ga. 646, 647 (2) (697 SE2d 757) (2010)).

Adams has not established that the trial court committed a clear and obvious error here by not giving more detailed instructions on the causation standard. To show clear and obvious error, the defendant must identify "on-point controlling authority" or "the unequivocally clear words of a statute or rule that plainly establish that the trial court erred." *Hill v. State*, 321 Ga. 177, 182 (913 SE2d 547) (2025) (citation and punctuation omitted). Adams has offered no such authority, statute, or rule in support of this plain-error claim. And we have rejected similar plain-error claims before where, as here, the trial court read the indictment's allegations as to how the defendant caused the victim's death; instructed the jury on the

18

statutory definition of felony murder, see OCGA § 16-5-1 ("A person commits the offense of murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice."); and told the jury that the State had the burden of proving "every material allegation of the Indictment and every essential element of the crime charged beyond a reasonable doubt." See *Campbell-Williams v. State*, 309 Ga. 585, 587-588 (2) (a) (847 SE2d 583) (2020) (citation omitted). See also *Flournoy v. State*, 294 Ga. 741, 746 (2) (755 SE2d 777) (2014) (concluding that an indictment alleging that the defendant caused the victim's death by shooting him during the commission of a felony, along with a jury instruction referencing those allegations, sufficiently informed the jury that a conviction required a finding that the defendant caused the death— thus, a separate instruction on proximate cause was unnecessary); *Pennie v. State*, 292 Ga. 249, 252 (2) (736 SE2d 433) (2013) (charge omitting proximate cause standard was sufficient where the charge as a whole informed "the jury that, in order to convict Appellant of the felony murder of [the victim], it had to determine that he caused

19

. . . the victim's death during the escape phase of the underlying felonies"). Therefore, Adams has not established that the trial court committed a clear and obvious error by failing to give more specific instructions on proximate cause.[7]

(c) Adams finally argues that it was plain error for the trial court to omit the felony-murder proximate cause standard in its response to a jury note.

During the jury's deliberations, the jury sent a note to the trial court, asking it to "[p]lease explain Count III in layman's terms." The following colloquy then took place on the record between the trial court and the parties regarding the note:

> COURT: I can re-read that section of the instructions. . . .
> TRIAL COUNSEL: They do have the charges, Your Honor. So -- but they've asked for it in layman's terms. Meaning, I would say, to indicate that they have difficulty understanding what is set out in the charges. I don't know if the Court [could] [] simplify it for them in some way[?]

---

[7] Although we reject the claim of plain error with respect to the trial court's jury instructions in this case, we recognize that there may be some factual scenarios where a more detailed instruction on proximate cause is necessary. See *Morris v. State*, 308 Ga. 520, 529 (4) (842 SE2d 45) (2020) ("A jury instruction must be adjusted to the evidence and embody a correct, applicable, and complete statement of law." (citation and punctuation omitted)).

20

COURT: I could. Do you guys agree to that?

PROSECUTOR: That's fine, Your Honor. That's fine.

TRIAL COUNSEL: Uh-huh (affirmative response). Yes. . . .

TRIAL COUNSEL: And I think your instruction that read would be -- yes -- you have to decide if the defendant committed a felony. And once you have decided -- the felony alleged being, being in possession of a firearm as a convicted felon. And then once you decide that[] you have then to decide if somebody [died] during the course of that felony.

COURT: Right.

TRIAL COUNSEL: I think that's pretty much standard. I think that that is sufficient, Your Honor.

COURT: Okay?

PROSECUTOR: Yes, Your Honor.

TRIAL COUNSEL: Yes, Your Honor.

The trial court then brought the jurors back into the courtroom and explained the following:

COURT: I've had an opportunity to talk with the State and with the Defense. And they have agreed on what I can say. So, what I'm going to do first, is first read Count III. That Mr. Adams with -- is charged with the offense of felony murder, for the said accused person in the County of Clayton, the State of Georgia, on or about the 5th day of September, 2017, while in the commission of the offense of possession of a firearm by a convicted felon, a felony, did cause the death of Sean Petersen, a human being, by shooting him. So, first you have to determine if a felony was committed as alleged. The felony as alleged to have been committed was that he was in possession of a

21

firearm by a convicted felon. That would be the felony. Then you must go on to determine whether during the course -- you must then determine that if the defendant caused the death of another while in the course of that felony.

"For purposes of plain error review, an affirmative waiver is the intentional relinquishment or abandonment of a known right." *Holloway v. State*, 320 Ga. 668, 671 (2) (911 SE2d 554) (2025) (citation and punctuation omitted). Here, the record shows that prior to the trial court's reading of its response to the jury, Adams's trial counsel suggested language that was included in the response and stated that the language was "sufficient" and "standard." And, when the trial court asked Adams's trial counsel whether she approved of the forthcoming response, she said, "Yes, Your Honor." Accordingly, because Adams—through his counsel—agreed to a response that did not include specific detail about proximate cause, he cannot now assert that the trial court's response constituted plain error. See *Hughes v. State*, 310 Ga. 453, 457 (2) (b) (851 SE2d 580) (2020) (the defendant affirmatively waived his right to challenge the trial court's response to a jury note that requested the trial court to

22

explain portions of the jury charge in layman's terms because the defendant "agreed that re-reading the indictment was the appropriate means to answer the jury's questions"). Therefore, Adams affirmatively waived any claim of error from the response by the trial court, so there was no plain error by the trial court. Thus, this claim fails.

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, McMillian, Colvin, and Pinson, JJ, concur.*

PINSON, Justice, concurring.

I join the opinion of the Court in full. With respect to the Court's conclusion in Division 3 (b) that the trial court did not commit plain error by failing to give more specific instructions on causation, I note that we have recently "clarified the standard for proving causation under our murder statute." *Melancon v. State*, 319 Ga. 741, 752 (3) (906 SE2d 725) (2024). In *Melancon*, we explained that

> Proving that a defendant caused the death of another human being requires proof of proximate cause. This showing has two components: cause in fact and legal cause. A defendant's conduct is a cause in fact of a death if the defendant's conduct played a substantial part in bringing about or actually causing the death — typically shown through evidence that the death would not have happened but for the defendant's conduct — or if the defendant's conduct materially accelerated the death. And a defendant's conduct is a legal cause of a death if the death was reasonably foreseeable — that is, a probable or natural consequence of the criminal conduct according to ordinary and usual experience, not a merely possible result.

Id. at 751 (2) (b) (cleaned up). An instruction along these lines would be both a correct statement of the law and useful to jurors who must

24

assess whether the State has proved beyond a reasonable doubt that the defendant has "cause[d] the death of another human being." OCGA § 16-5-1 (c). See *Morris v. State*, 308 Ga. 520, 529 (4) (842 SE2d 45) (2020) ("A jury instruction must be adjusted to the evidence and embody a correct, applicable, and complete statement of law.").