**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 23, 2025**

# In the Court of Appeals of Georgia

A23A0517. MELANCON v. THE STATE.

MCFADDEN, Presiding Judge.

After a jury trial, Sidrick Melancon, Sr. was convicted of second-degree murder and witness interference in connection with the death of his nine-month-old daughter, Laura Higgenbotham, from physical abuse inflicted by the girl's mother, Sadai Higgenbotham.[1] We affirmed those convictions in *Melancon v. State*, 368 Ga. App. 340 (890 SE2d 113) (2023) (*Melancon I*). Among other things, we found the evidence of second-degree murder sufficient under one of three theories of causation asserted by the state: that Melancon caused Laura's death by instructing another person in his

---

[1] Melancon was also charged with, and the jury found him guilty of, second-degree child cruelty. Because the trial court merged that count into the second-degree-murder count, Melancon's appellate claims related to the second-degree-child-cruelty verdict are moot. See *Starks v. State*, 320 Ga. 300, 307 (3) (b) (908 SE2d 614) (2024).

household not to cooperate with a Department of Family and Children Services (DFCS) investigation into Higgenbotham's abuse of the child. Id. at 345-347 (1).

The Supreme Court of Georgia vacated our judgment in *Melancon v. State*, 319 Ga. 741 (906 SE2d 725) (2024) (*Melancon II*), holding that we erred in finding the trial evidence sufficient to show that Melancon caused Laura's death under the particular theory of causation we considered. Id. at 752-758 (3). The Court instructed us to, on remand, "consider in the first instance whether the evidence of causation in this case was sufficient under [either of the state's other two theories of causation]." Id. at 758 (4).

As detailed below, we vacate Division 1 of our earlier opinion, which addressed Melancon's challenge to the sufficiency of the evidence of second-degree murder. In its place we adopt as our own the Supreme Court's decision in *Melancon II*. Further, having considered the sufficiency of the evidence as to the state's other two theories of causation, we hold that the evidence did not authorize the jury to find him guilty of second-degree murder for leaving Laura alone with Higgenbotham, but that it did authorize the jury to find Melancon guilty of second-degree murder for failing to seek adequate and necessary medical attention for Laura's injuries.

Our Supreme Court's decision in *Melancon II* also affects Melancon's fatal-variance claim, which we addressed in Division 2 of our earlier opinion. We reconsider the claim and again hold that Melancon has not shown reversible error for the same reasons set forth in *Melancon I*.

Finally, our Supreme Court neither addressed nor considered Division 3 of our earlier opinion, which addressed Melancon's claim that he received ineffective assistance of trial counsel. Because Division 3 is not inconsistent with the Court's opinion in *Melancon II*, it becomes binding upon the return of the remittitur. *Shadix v. Carroll County*, 274 Ga. 560, 563 (1) (554 SE2d 465) (2001).

So we again affirm the judgment of conviction.

1. *Facts*

The evidence, viewed most favorably to the verdict, is set out in detail in *Melancon II*, 319 Ga. at 742-745 (1) (a). See also *Melancon I*, 368 Ga. App. 340-344 (1). Nine-month-old Laura died on August 7, 2017

> as a result of injuries caused by intentionally inflicted head trauma and blunt force injuries to her head, neck, abdomen, back, arms, and legs, which were all in a state of healing. Laura had recent brain injuries that reflected massive trauma, including brain bleed and retinal hemorrhage, and she had spinal injuries and leg fractures, including some older

fractures that were partially healed. She also had injuries consistent with undergoing violent shaking back and forth.

*Melancon II*, 319 Ga. at 744-745 (1) (a).

At the time of her death, Laura lived in an apartment with Melancon (her father), Higgenbotham (her mother), Gerralyn Long (Melancon's current girlfriend), and Melancon and Long's three children. *Melancon II*, 319 Ga. at 742 (1) (a). "Melancon exerted significant control over Long and Higgenbotham and physically abused both women." Id. at 742-743 (1) (a). In the months leading up to Laura's death, Higgenbotham had physically abused the child in Long's presence, and Melancon knew about some of that abuse. Id. at 743 (1) (a).

Two months before Laura's death, Long showed Melancon pictures of a bruise and a fingernail mark on the child's face and asked Melancon for permission to notify DFCS about the injuries. *Melancon II*, 319 Ga. at 743 (1) (a). At first Melancon agreed, but after Long initiated that process he changed his mind; he instructed Long not to file a report with DFCS and Long stopped cooperating with the DFCS investigator, who ultimately closed the case because he could not locate Higgenbotham or Laura. Id. at 743-744 (1) (a).

For several days after the incident involving DFCS, Melancon "had Long look after Laura," telling Higgenbotham that he had taken Laura from her because she was abusing the girl and that he did not believe Higgenbotham's explanations for Laura's injuries. *Melancon II*, 319 Ga. at 743 (1) (a).

At a well-baby check about two weeks before Laura's death, a nurse practitioner did not note any concerns about abuse or neglect. *Melancon II*, 319 Ga. at 744 (1) (a). Laura subsequently sustained more injuries, including scratches and a leg fracture. Id.

Around noon on August 5, Higgenbotham texted Melancon that Laura had been sleeping since he left for work, would not wake up, and "felt hot." Between 3:30 and 4:00 p.m., with Melancon's permission, Higgenbotham left for work, leaving Laura alone in her room. (Long was home but in her own bedroom.)

Around 4:00 p.m., Melancon came home and brought Laura, who was strapped tightly in her car seat, to Long in their bedroom. Melancon then left the apartment. Long noticed that Laura was not moving and had one eye open and one eye shut. Long removed Laura from the car seat and realized that she was strapped into the car seat because she was unconscious — when Long lifted Laura, her limbs and head dropped immediately. Long saw that one of Laura's pupils was dilated and the other was small, she was drooling on one side of her mouth, her breathing was labored, her heartbeat was fast, and she had thick blood in her mouth. Long called Melancon and tried CPR on Laura. Melancon

told Long not to call 911 because he was nearby and would drive her to urgent care, which he did.

*Melancon II*, 319 Ga. at 744 (1) (a). They arrived at urgent care, which was a three-minute drive from Melancon's apartment, shortly after 5:00 p.m.

When she arrived at urgent care, Laura "appeared gray, was not breathing, and her head was slumped over in the car seat. Medical personnel tried to resuscitate Laura and called 911. Laura was eventually taken by helicopter to the pediatric intensive care unit of a children's hospital, where she was declared brain dead on August 7. She died later that day." *Melancon II*, 319 Ga. at 744 (1) (a).

"A medical expert testified that the nature and location of Laura's injuries[, described above,] indicated that they were likely inflicted intentionally and that she had been in distress for several hours before being taken to urgent care." *Melancon II*, 319 Ga. at 745 (1) (a). Expert medical witnesses testified that the serious nature of the injuries would have been obvious, even to a layperson. The medical examiner who performed the autopsy testified it is possible for a child to survive such injuries if, within four to five hours, the child receives medical intervention.

2. *Sufficiency of the evidence of second-degree murder*

"A person commits the offense of murder in the second degree when, in the commission of cruelty to children in the second degree, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (d). "[A] person commits the offense of cruelty to children in the second degree when such person with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (c). "Criminal negligence is an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." OCGA § 16-2-1 (b).

So to authorize Melancon's second-degree-murder conviction, the evidence must have shown that he acted or failed to act in a way that demonstrated a willful, wanton, or reckless disregard for Laura's safety, under circumstances where Laura might reasonably have been expected to be injured by Melancon's act or failure to act (to establish the criminal negligence needed for second-degree child cruelty); and that Melancon's act or failure to act both caused Laura cruel or excessive physical or mental pain (to establish the second-degree child cruelty needed for second-degree murder) and caused her death (to establish second-degree murder).

"[T]he causation required [for second-degree murder] encompasses two distinct concepts: cause-in-fact, and legal cause." *Melancon II*, 319 Ga. at 746 (2). As our Supreme Court explained in *Melancon II*:

> A defendant's conduct is a cause in fact of a death if the defendant's conduct played a substantial part in bringing about or actually causing the death — typically shown through evidence that the death would not have happened but for the defendant's conduct — or if the defendant's conduct materially accelerated the death. And a defendant's conduct is a legal cause of a death if the death was reasonably foreseeable — that is, a probable or natural consequence of the criminal conduct according to ordinary and usual experience, not a merely possible result.

Id. at 751 (2) (citations and punctuation omitted).

Our Supreme Court held in *Melancon II* that the evidence of the steps Melancon took to prevent DFCS from investigating Higgenbotham's abuse of Laura two months before her death (one of the state's three theories of causation) was insufficient to show either cause-in-fact or legal cause. *Melancon II*, 319 Ga. at 752-759 (3). The Court held that the cause-in-fact requirement was not met because the evidence did not permit any inference about "further actions DFCS might have taken and whether any such actions would have prevented Higgenbotham from inflicting fatal head trauma

8

to Laura months later. . . ." *Melancon II*, 319 Ga. at 754 (3) (a) (punctuation omitted). The Court held that the legal-cause requirement was not met because the evidence did not permit the conclusion that "the intervening act of Higgenbotham inflicting fatal injuries, including massive head trauma on Laura almost two months later, was a natural or probable consequence of [Melancon's act of preventing Long from cooperating with DFCS]." Id. at 755 (3) (b). The Court emphasized the milder nature of Laura's earlier injuries and held there was no evidence that Higgenbotham had inflicted any potentially fatal abuse upon Laura before the abuse that killed her. Id. at 756 (3) (b).

Guided by the legal framework set forth in *Melancon II*, we now consider the merits of the other two theories of causation that the state asserts in support of Melancon's conviction for second-degree murder: that he "le[ft] the child alone with Sadai Higgenbotham knowing that Sadai Higgenbotham was abusive toward the child"; and that he "fail[ed] to seek adequate and necessary medical attention for said child's injuries[.]" As detailed below, the theory based on Melancon leaving Laura alone with Higgenbotham fails for the same reasons as the theory our Supreme Court rejected in *Melancon II*. But the evidence, viewed most favorably to the verdict,

authorized the jury to find Melancon guilty of second-degree murder based on his failure to immediately seek medical attention for Laura after finding her severely injured when he returned home from work on the afternoon of August 5, 2017.

(a) *Leaving Laura alone with Higgenbotham*

In the indictment, the state charged Melancon with committing second-degree murder "by leaving [Laura] alone with Sadai Higgenbotham knowing that Sadai Higgenbotham was abusive toward the child[.]" Melancon argues that this theory of causation fails because, although he was Laura's biological father, he was not married to Higgenbotham and had not legitimated the child, which he asserts means he could not have removed her from Higgenbotham's care. See OCGA § 19-7-25 (a mother may "exercise all parental power over [a] child" who is born out of wedlock and who has not been legitimated). But see OCGA § 19-7-24 (a putative father of a child born out of wedlock has a legal duty "to provide for the . . . protection . . . of the child"); *Strickland v. State*, 211 Ga. App. 48, 49 (1) (438 SE2d 161) (1993) (applying OCGA § 19-7-24 in the prosecution of a putative father for child cruelty). We need not address this question because, even if he had the power to prevent Higgenbotham from being

alone with Laura, we agree with Melancon's alternative argument that his failure to do so was not the legal cause of Laura's death.

Our Supreme Court found in *Melancon II* that "there was no evidence that Higgenbotham had inflicted any potentially fatal injuries before Laura's death, much less that Melancon knew about any such incidents." 319 Ga. at 756 (3) (b). That finding was important to the Court's conclusion that

> although the evidence may have offered a basis for believing that Laura's later death at Higgenbotham's hands was a *possible* consequence of preventing Long from cooperating with DFCS, [the theory of causation addressed in *Melancon I* and *Melancon II*,] the record does not support a finding that Laura's death by violent head trauma could reasonably have been anticipated, apprehended, or foreseen as the consequence of [Melancon's] instruction [to Long].

Id. (citation and punctuation omitted; emphasis supplied). In other words, the Court held that Melancon could not have reasonably anticipated that Higgenbotham's abuse would lead to Laura's death because the injuries that ultimately killed the child were the first potentially fatal injuries that Higgenbotham inflicted upon her.

That holding is binding upon us. See OCGA § 9-11-60 (h) ("any ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent

11

proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be"). And although the Supreme Court applied it to a different theory of causation in *Melancon II*, it is equally applicable to the state's theory that Melancon caused Laura's death by leaving her alone with Higgenbotham. Because there is no evidence that Higgenbotham had inflicted any potentially fatal abuse upon Laura, or that Melancon had known of any potentially fatal abuse, before the abuse that actually killed the child, "the record does not support a finding that Laura's death by violent head trauma could reasonably have been anticipated, apprehended, or foreseen as the consequence of [leaving the child alone with Higgenbotham]." *Melancon II*, 319 Ga. at 756 (3) (b) (citation and punctuation omitted).

(b) *Failure to seek medical care for Laura*

The state's claim that Melancon committed second-degree murder "by failing to seek adequate and necessary medical attention for [Laura's] injuries" requires a different analysis. The state's argument focuses primarily on Melancon's actions on the afternoon of August 5, 2017, *after* the injuries that proved fatal had been inflicted upon Laura.

The evidence, viewed most favorably to the verdict, shows that Melancon returned home from work around 4:00 p.m. to find Laura in distress, with significant injuries obvious to a layperson. Melancon knew that earlier in the day Laura had "felt hot" and could not be awakened. But instead of immediately obtaining medical care for the child, Melancon gave her to Long and left the residence.

A jury could find that, by doing so, Melancon demonstrated a willful, wanton, or reckless disregard for Laura's safety that constitutes criminal negligence. See OCGA § 16-2-1 (b). Further, a jury could find that such criminal negligence was both the cause-in-fact and legal cause of cruel or excessive physical pain to Laura, thereby establishing the second-degree child cruelty necessary for a second-degree-murder conviction. See OCGA §§ 16-5-1 (d), 16-5-70 (c).

"[T]he failure to seek timely medical care for a child may form the basis for the offense of cruelty to children." *Grayer v. State*, 282 Ga. 224, 225 (1) (647 SE2d 264) (2007). See also *Rosenbaum v. State*, 373 Ga. App. 417, 427 (2) (d) (908 SE2d 672) (2024); *Tamayo v. State*, 371 Ga. App. 494, 499 (2) (d) (901 SE2d 310) (2024); *Landell v. State*, 357 Ga. App. 207, 209 (1) (850 SE2d 419) (2020). Whether a child experienced the cruel or excessive pain required for child cruelty generally is a jury

question. *Kennedy v. State*, 277 Ga. 588, 589 (1) (a) (592 SE2d 830) (2004); *Tamayo*, supra. Expert testimony is not required to show that a baby suffered pain, *Grayer*, supra at 226 (1), and evidence supporting a conclusion that a defendant caused a child cruel or excessive physical pain can include evidence of the child's age and the extent and nature of the injuries. *Moore v. State*, 283 Ga. 151, 153 (1) (656 SE2d 796) (2008). A jury could find from the evidence in this case that Laura's pain could have been more quickly alleviated if Melancon had obtained medical care for her immediately upon returning home at 4:00 p.m.; that his delay in doing so caused her to suffer physical pain she otherwise would not have (cause-in-fact); and that given the obvious severity of her injuries, such additional suffering was a probable or natural consequence of that delay (legal cause).

Likewise, a jury could find that Melancon's delay was the cause-in-fact and legal cause of Laura's death. A jury could infer that Laura sustained the ultimately fatal injuries around noon on August 5 (around the time that Higgenbotham texted Melancon with concerns about Laura's condition). Expert medical testimony suggests that Laura could have survived the injuries if she received medical attention within the next five hours. Melancon could have obtained medical care for Laura within that five-

hour window if he had taken her to urgent care as soon as he arrived home at 4:00 p.m. to find Laura in distress, as urgent care was only a three-minute drive from his apartment. Instead, Laura did not arrive at urgent care until after 5:00 p.m, outside the five-hour window.

There was evidence that this delay, while short, was critical; indeed, evidence was presented that Laura went into cardiac arrest shortly before emergency medical services personnel arrived at the urgent care facility. A jury could find that the delay foreclosed the only conceivable way of saving Laura's life.

And given the severity of her condition, which medical experts testified would have been obvious and noticeable even to a layperson, a jury could find that her death without immediate medical attention was reasonably foreseeable. See *Virger v. State*, 305 Ga. 281, 289 (3) (824 SE2d 346) (2019) (evidence was sufficient to show that a defendant's failure to seek prompt medical aid for a child was a proximate cause of the child's death where there was testimony that medical intervention would have given the child the "best chance of surviving her injuries") (punctuation omitted); *Jones v. State*, 302 Ga. 488, 491 (1) (b) (807 SE2d 344) (2017) (evidence that the defendant delayed taking a gravely injured one-year-old child to the hospital authorized the jury

15

to find that the defendant proximately caused the child's death); *Johnson v. State*, 292 Ga. 856, 858 (1) (742 SE2d 460) (2013) (evidence that the defendant delayed calling 911 after finding her three-year-old child unresponsive, having apparently ingested methadone, showed the proximate cause required to find the defendant guilty of second-degree murder); *Grayer*, 282 Ga. at 225-226 (1) (evidence that a premature baby "could have been viable and would thus have benefitted from supportive medical care" was sufficient to show that the defendant's refusal to allow the mother and baby to go to the hospital after a home birth caused the baby's death).

Melancon argues other decisions — *Glenn v. State*, 278 Ga. 291 (602 SE2d 577) (2004); *Johnson v. State*, 269 Ga. 840 (506 SE2d 374) (1998); and *Bell v. State*, 362 Ga. App. 687 (870 SE2d 20) (2022), rev'd, 317 Ga. 519 (893 SE2d 918) (2023) — are more applicable to the question of whether the evidence of causation was sufficient in this case. But the decisions on which he relies have material differences from this case. Both *Glenn*, supra at 294-295 (1) (b), and *Johnson*, supra at 842, asked whether the evidence was sufficient for first-degree child cruelty, which, unlike second-degree child cruelty, requires a showing of malicious intent. Compare OCGA § 16-5-70 (b) with OCGA § 16-5-70 (c). And in *Bell*, supra at 700-702 (1), we reversed a second-

16

degree murder conviction because there was no evidence to show that the defendant committed that offense in the manner alleged in the indictment.

In summary, the evidence authorized the jury's verdict under the theory that Melancon committed second-degree murder by failing to seek adequate and necessary medical attention for Laura's injuries. In a supplemental brief after the Supreme Court remanded this case to us, Melancon argues for the first time that we should give the verdict less deference because the jury was not instructed on the definition of proximate cause. But he did not enumerate the jury charge as error, and he cannot expand his enumeration in his brief. See *Wallace v. State*, 303 Ga. 34, 37-38 (2) (810 SE2d 93) (2018).

3. *Fatal variance*

Melancon asserts, in a separate enumeration of error, that there was a fatal variance because the state argued that he committed second-degree murder and second-degree child cruelty in a different way than alleged in the indictment. We addressed this argument in *Melancon I*, and having reconsidered it in light of *Melancon II* and our sufficiency analyses, discussed above, we conclude that our reasoning in that decision still applies.

It appears that this enumeration reiterates Melancon's challenge to the sufficiency of the evidence . . . and so it fails for the same reason . To the extent this enumeration also challenges the state's closing argument, Melancon did not object to that argument at trial, so he has waived appellate review of alleged errors based on that argument.

*Melancon I*, 368 Ga. App. at 347 (2) (citations omitted).

4. *Ineffective assistance of counsel*

As stated above, our Supreme Court neither addressed nor considered Division 3 of our earlier opinion, in which we found no merit in Melancon's claim that he received ineffective assistance of trial counsel. *Melancon I*, 368 Ga. App. at 347-349 (3). And that Division is not inconsistent with the Court's opinion in *Melancon II*. So that Division "become[s] binding upon the return of the remittitur." *Shadix*, 274 Ga. at 563 (1).

*Judgment affirmed. Brown and Markle, JJ., concur.*